NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

————————————————————
                                  :
DANIEL VARLEY,                    :
                                  :  Civil Action No. 14-3832 (RMB)
              Plaintiffs,         :
                                  :
         v.                       :
                                  :
THE UNITED STATES                 :
OF AMERICA, et al.,               :   **MEMORANDUM OPINION**
                                  :
              Defendants.         :
————————————————————:————————

**BUMB**, District Judge:

This matter comes before the Court upon Plaintiff's amended complaint ("Amended Complaint") submitted after this Court's <u>sua sponte</u> screening and non-prejudicial dismissal of his original complaint ("Original Complaint"). <u>See</u> Docket Entries Nos. 1-4.

Plaintiff, a federal inmate formerly confined at FCI Fort Dix ("Fort Dix"), asserts that, on October 25, 2011, while he was at Fort Dix common-quarters playing cards with other inmates, a television (mounted on the wall or ceiling) fell and hit his head. <u>See</u> <u>id.</u> at 5; <u>see</u> <u>also</u> Docket Entry No. 4, at 3, 16, 22. Alleging that he suffered multiple serious injuries as a result of that accident, Plaintiff timely filed a Federal Tort Claims Act ("FTCA") claim against the Government alleging negligence on the part of its agents, invoking the <u>res ipsa loquitor</u> legal

principle and seeking $1 million in damages.  See Docket Entry No. 4, at 14, 16, 22.

To justify his claim for said amount, he claimed that, prior to the accident, he was in perfect health but after the accident he had a "concussion, chronic post concessive syndrome (with post-traumatic headaches, dizziness[] and lightheadedness), [an unspecified] vestibular dysfunction due to inner ear trauma, [an unspecified] eyelid dysfunction, cervicalis and related neck/back pain, [an unspecified] shoulder pain, [an unspecified] arm pain, spinal spondylosis, emotional disturbances and a scalp laceration."  Id. at 16-17 (parenthetical in original).[1]

The Government denied Plaintiff's FTCA claim stating:

Damages are sought in the amount of $1,000,000.00 based on a personal injury claim.  Specifically, [Plaintiff alleged that he] was injured when a television hit his head at FCI Fort Dix on October 25, 2011. Investigation reveals [that Plaintiff] was medically assessed by FCI Fort Dix Health Services staff after a television allegedly fell on him.  His assessment was unremarkable and [revealed merely a scalp laceration, and] he was transported to a community hospital where [that] laceration was closed.  No acute spinal or skull injury was noted.  Subsequent examinations by specialists showed [Plaintiff's] back and neck pain were not caused by a traumatic event.  Throughout his incarceration at FCI Fort Dix, [Plaintiff] received appropriate medical treatment, including evaluations by specialists, as necessary.  There is no evidence to suggest he experienced a compensable loss as the result of

---

[1]   The Court notes Plaintiff's contradictory allegations: that, prior to the alleged incident, he was in perfect health but numerous preexisting medical conditions negatively affected his spine as a result of the accident.

2

> *negligence* on the part of any [Government agents]. . .
> . [Plaintiff's $1,000,000.00] claim is denied.

Id. at 22 (emphasis supplied).


From the denial it appears, although it is unclear, that the Government conceded the negligence aspect but clearly disputed the injuries/damages claimed by Plaintiff.  See id.  Notified of the denial, Plaintiff filed his Original Complaint asserting the same facts, claiming that he suffered the same numerous serious injuries and seeking $1 million in damages.[2]  See Docket Entry No. 1. However, instead of asserting that his injury was caused by negligence of the Government agents (as he did during his underlying administrative proceeding), Plaintiff altered his legal position and: (a) named an unknown manufacturer/designer ("Producer") of the television mount and the Producer's staff ("Staff") as defendants; and (b) de facto raised the "alternative

---

[2]  Although the administrative process envisions a negotiation and settlement stage, including resort to alternative dispute resolution techniques, "[a]s is typical in tort settlement discussions, the agency will seek information to justify a claim."  http://apps.americanbar.org/abastore/products/books/abstracts/5010071%20chap%205_abs.pdf; see also See The Administrative Claim Process: Procedural prerequisites to Making a Tort Claim at 50, n.23 http://apps.americanbar.org/abastore/products/books/abstracts/5010071%20chap%205_abs.pdf("Absent a delegation of greater authority[,] an agency has $25,000 in settlement authority") (citing 28 C.F.R. §§ 14.6(b)-(e) and 14.10).  This Court has no information as to whether Plaintiff was asked to provide and did furnish any information substantiating his claim that he suffered injuries, other than the laceration, as a result of the accident.  See generally, Docket Entries Nos. 1, 4.

3

liability" theory by stating that his injuries had to be caused
either by negligence of the Government agents maintaining the
Fort Dix or the Producer/Staff's negligent design/manufacturing
of the mount.  See id.  That said, the Original Complaint still
invoked the res ipsa loquitor principle.  See id. (maintaining
that, if the Producer/Staff were not negligent, then it
necessarily had to be that the Government agents were negligent
or, in the alternative, if the Government agents were not
negligent, then it necessarily had to be that the Producer/Staff
were negligent because the television could not have possibly
fallen on Plaintiff unless one of these two scenarios played
out).

      Pursuant to 28 U.S.C. § 1915A(a) and (b), and 42 U.S.C. §
1997e(c), this Court screened the Original Complaint for sua
sponte dismissal.  See Docket Entry No. 3.  The Court noted that
the FTCA claim was jurisdictionally deficient for Plaintiff's
failure to plead the amount sought during the administrative
process and directed him to correct that oversight.  See id. at
2-3.  Then, turning to Plaintiff's pleading of the res ipsa
loquitor principle in lieu of any facts implicating the Producer/
Staff, this Court explained that such pleading did not comport
with Rule 8.  See id. at 3 (citing Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009)).  In addition, this Court pointed out that,

      [g]enerally, where there are multiple defendants, the
      court must be presented with allegations supporting a

4

legal conclusion that the defendants had joint control
over the injury-inflicting instrumentality.  <u>See</u>
<u>Creekmore v. United States</u>, 905 F.2d 1508 (11th Cir.
1990); <u>accord</u> <u>Allendorf v. Kaiserman Enters.</u>, 266 N.J.
Super. 662, 630 A.2d 402 (N.J. Super. Ct. App. Div.
1993) (joint control by building owner and company
maintaining elevator); <u>Meny v. Carlson</u>, 6 N.J. 82, 94,
77 A.2d 245 (1950) (joint control of scaffolding); <u>cf.</u>
<u>Smith v. Claude Neon Lights, Inc.</u>, 110 N.J.L. 326, 164
A. 423, 1933 N.J. LEXIS 488 (Ct. E. & App. 1932)
(building owner and owner of the sign that fell from
the building).  While, in <u>Anderson v. Somberg</u>, 67 N.J.
291, 338 A.2d 1 (1975), the Supreme Court of New Jersey
"accorded a greater protection to innocent plaintiffs
in a <u>res</u> <u>ipsa</u> <u>loquitor</u> case involving strict products
liability by one defendant and negligence" by another,
<u>Huddell v. Levin</u>, 537 F.2d 726, 746 (3d Cir. 1976)
(discussing <u>Anderson</u>), the lenient "holding in <u>Anderson</u>
was restricted to instances in which the plaintiff
suffered injury while being an unconscious hospital
patient."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Shackil v. Lederle</u>
<u>Laboratories, Div. of American Cyanamid, Co.</u>, 116 N.J.
155, 173, 561 A.2d 511 (1989) (cautioning against
application of <u>Anderson</u> to other circumstances because
the "approach, which could conceivably be characterized
as one of alternative liability, has not been
duplicated in any New Jersey case since <u>Anderson</u> thus
rendering the <u>Anderson</u> holding limited to one factual
context").

<u>Id.</u> at 3-4 (brackets omitted).

Since "Plaintiff was not an unconscious hospital patient

when the television allegedly fell on him," <u>id.</u> at 4 (internal

quotation marks omitted), this Court directed him to replead his

claims with the degree of specificity required by Rule 8, as

explained in <u>Iqbal</u> and <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203,

211 (3d Cir. 2009), and to file his position statement detailing

his basis, if any, for his current reliance on the <u>res</u> <u>ipsa</u>

<u>loquitor</u> principle and for adopting an <u>Anderson</u>-like theory.  <u>Id.</u>

at 4-5.  The Amended Complaint followed.  <u>See</u> Docket Entry No. 4.

As to Plaintiff's FTCA claim, the Amended Complaint duly cured the deficiencies by: (a) asserting that the administrative claim was also in the amount of $1,000,000; and (b) averring that Plaintiff did not commit any act that contributed to or caused his alleged injuries, and no persons other than Government agents caused his injuries.  <u>See</u> <u>id.</u>

However, the remainder of Plaintiff's Amended Complaint and his position statement: (a) merely recited the facts already stated in the Original Complaint; (b) repeated an unadorned reference to the <u>res</u> <u>ipsa</u> <u>loquitor</u> principle; and (c) recited an <u>Anderson</u>-like theory by claiming that, if the television fell, it must mean either that the Government agents were negligent or the Producer and its Staff were negligent.  <u>See</u> <u>id.</u>  The position statement closed with a request for discovery so Plaintiff would gather facts needed to implicate, exclusively, either the Government agents or the Producer and its Staff, or "any other parties liable in this matter."[3]  <u>See</u> <u>id.</u> at 25-26.  So drafted, the Amended Complaint, albeit a represented pleading, evinces Plaintiff's misreading of Rule 8 requirements, as well as his

---

[3]  Plaintiff's reference to "any other parties liable in this matter" suggests his realization that the acts or omissions of persons/business entities other than the Government agents and Producer/Staff might have been ultimately the reason why the television fell on Plaintiff.  <u>Accord</u> this Opinion, note 3.

misunderstanding of the res ipsa loquitor principle, the
circumstances allowing reliance on the alternative liability
theory, the preponderance of evidence standard governing to the
law of torts and the unavoidable uncertainties of litigation.

It is axiomatic that the pleading requirements of Rule 8
should state the *facts* underlying a plaintiff's claim, not that
plaintiff's self-serving conclusions, bold deducements, factless
conjecture or alternative speculations.

> A pleading that offers "labels and conclusions" or "a
> formulaic recitation of the elements of a cause of
> action will not do." . . . [A viable] complaint must
> contain sufficient factual matter . . . to "state a
> claim to relief that is plausible on its face." . . .
> The plausibility standard . . . asks for more than a
> sheer possibility that a defendant has acted
> unlawfully.  . . .  Threadbare recitals of the
> elements of a cause of action, supported by mere
> conclusory statements, do not suffice.  Rule 8 . . .
> does not unlock the doors of discovery for  a
> plaintiff armed with nothing more than conclusions.

Iqbal, 556 U.S. at 677-79.

In fact, in Iqbal, a plaintiff-detainee attempted to plead
his claims by asserting alternative theories.  He challenged his
harsh treatment while in detention and maintained that the
treatment had to be discriminatorily based on his race, religion,
or national origin.  See id. at 666-69.  In order to "hedge his
bets," he named, as defendants, the prison officers who subjected
him to the challenged treatment and, in addition, many high-
ranking government officials, all in order to assert that, even

7

if the prison officers mistreated him without a discriminatory intent, then it must have been that there were discriminatory policies that the high-ranking officials coined and made the prison officers to comply with, and that compliance had to produce the alleged harsh treatment.  <u>Id.</u>  The high-ranking officials moved for dismissal of the detainee's complaint pointing out that his alternative theories could not qualify as facts implicating them in any wrong.  <u>See id.</u> at 669.  The Supreme Court agreed, stressing that, under Rule 8, the detainee was not allowed to hale any defendant into the court unless he could plead actual facts personally and plausibly implicating that defendant in the alleged wrongs.  <u>See id.</u> at 676-77. Derivatively, the <u>Iqbal</u> Court concluded that the detainee could neither obligate any defendant to disprove the detainee's factless hypotheses nor could he force the defendants to litigate his hypotheses among themselves, so the defendants would try to pin his claims on each other.  Focusing on <i>that</i> legacy of <u>Iqbal</u>, the Court of Appeals observed that <u>Iqbal</u> hammered "the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before [<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), the predecessor of <u>Iqbal</u>]." <u>Fowler</u>, 578 F.3d at 210.[4]  Therefore, unless Plaintiff states actual facts

_____

[4] The <u>Fowler</u> Court referred to the standard in <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), that allowed for a construction of

8

personally implicating *each* Defendant he names, Plaintiff's
claims against those Defendants as to whom no such facts are
asserted necessarily fail to pass muster under Rule 8 and are
subject to dismissal for failure to state a claim upon which
relief can be granted, *without any discovery*.[5]  Here, no fact in
Plaintiff's Original and Amended Complaints implicates the
Producer or its Staff, or any other unspecified entity.
Moreover, while Plaintiff's Original Complaint did, and his
Amended Complaint does, state an <u>Iqbal</u>-plausible FTCA negligence
claim against the Government, his continuous attempts to "hedge

---

the Rule 8 pleading requirement in a fashion effectively allowing
for such distorted litigation process simply because one sentence
in <u>Conley</u> read that "a complaint should not be dismissed for
failure to state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim,"
thus suggesting that even a factless, speculative claim had to be
deemed viable unless it was wholly "fantastical or delusional" on
its face.  <u>See</u> <u>Denton v. Hernandez</u>, 504 U.S. 25, 33 (1992).

   [5]   <u>See</u> <u>Twombly</u>, 550 U.S. at 558-60 ("It is no answer to say
that a claim just shy of a plausible entitlement to relief can,
if groundless, be weeded out early in the discovery process
through 'careful case management,' given the common lament that
the success of judicial supervision in checking discovery abuse
has been on the modest side.  And it is self-evident that the
problem of discovery abuse cannot be solved by 'careful scrutiny
of evidence at the summary judgment stage,' much less 'lucid
instructions to juries,' the threat of discovery expense will
push cost-conscious defendants to settle even anemic cases before
reaching those proceedings.  Probably, then, it is only by taking
care to require allegations that reach the level suggesting [an
actual viable claim] that we can hope to avoid the potentially
enormous expense of discovery in cases with no 'reasonably
founded hope that the discovery process will reveal relevant
evidence' to support a . . . claim") (citations and internal
quotation marks omitted).

his bets" yielded a legal position incompatible with his current reliance on res ipsa loquitor: because res ipsa loquitor is merely a short-hand reference to a common law principle of circumstantial evidence.

> Negligence, like any other fact, may be proved by circumstantial evidence. This is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. . . . Like any other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. The gist of it, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. It is not enough that plaintiff's counsel can suggest a possibility of negligence. The evidence must sustain the burden of proof by making it appear more likely than not. The inference must cover all elements of negligence, and must point to a breach of the defendant's duty. . . . One type of circumstantial evidence . . . is that which is given the name of res ispa loquitor.

W. Page Keeton, Prosser and Keeton on the Law of Torts, §39, 242-43 (5th ed. 1984) (footnotes omitted).

Stressing that res ipsa loquitor was nothing but a reference to a certain "type of circumstantial evidence," and the reference represented "two principles, one concerning with the sufficiency of circumstantial evidence, the other with the burden of proof, [that] gradually became confused and intermingled, and from which fusion there developed an uncertain [modern] 'doctrine' of res ipsa loquitor," the treatise explains:

10

The statement of the doctrine most often quoted is that
. . . '[t]here must be reasonable evidence of
negligence; but where the thing is shown to be under
the management of the defendant or his servants, and
the accident is such as in the ordinary course of
things does not happen if those who have the management
use proper care, it affords reasonable evidence, in the
absence of explanation by the defendant, that the
accident arose from want of care.' The conditions
usually necessary [but not always sufficient] for the
application of the principle of <u>res ipsa loquitor</u> . . .
are as follows: (1) the event must be of the kind which
ordinarily does not occur in the absence of someone's
negligence; (2) it must be caused by an . . .
instrumentality within the exclusive control of the
defendant; and (3) it must not have been due to any
voluntary action or contribution of the part of the
plaintiff."

<u>Id.</u> at 244 (citations and footnote omitted).

Applying this test to the "quite intricate question[] where

the plaintiff proceeds against two or more defendants," the

treatise clarifies that "the logical rule . . . is . . . that the

plaintiff does not make out a preponderant case against either of

two defendants by showing merely that the plaintiff has been

injured by the negligence of one *or* the other."   <u>Id.</u> at 251

(emphasis supplied).  Correspondingly, a plaintiff's attempt to

"hedge his bets" by naming each and every hypothetical entity as

defendant, without stating actual facts sufficient to yield a

preponderant case against these defendants, is a litigation

tactic stripping the plaintiff from a chance to prevail on any of

his claims.  <u>See</u> <u>id.</u> at 242 ("It is often said that negligence

must be proved, and never will be presumed.  . . .  What is

required is evidence, which means some form of proof; and it must be evidence from which reasonable persons may conclude that, upon the whole, it is more likely that the event was caused by negligence than that it was not.  As long as the conclusion is a matter of speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that the burden of proof has not been sustained").  In sum, the plaintiff must state the facts he has and, upon accepting the uncertainties inherent to the process of litigation, make a <u>bona</u> <u>fide</u> argument, if such is available, that these facts amount to a preponderant case against the defendant actually implicated by the facts.  <u>See</u> <u>id.</u> at 247-48 ("The inference of negligence may arise where a definitive cause is known, or where the accident is more or less a mystery, with no particular cause indicated [because t]he plaintiff is not required to eliminate with certainty all other possible causes or inferences, which would mean that the plaintiff must prove a civil case beyond reasonable doubt.  All that is needed is evidence from which reasonable persons can say that on the whole it is more likely that there was [a particular defendant's] negligence associated with the cause of the event than there was not").

     In light of the foregoing, Plaintiff's reliance on the <u>res</u> <u>ipsa loquitor</u> principle during his administrative proceeding, <u>see</u>

12

Docket Entry No. 4, at 16, was not unreasonable since, at *that* stage, Plaintiff was focusing on the time when the mounted television was in exclusive control of the Government agents maintaining the Fort Dix.  Here, his *current* reliance on <u>res ipsa loquitor</u> is misplaced since: (a) he is focusing on the entire lifetime of the mount, from the moment of its design and until the time when the television fell on Plaintiff; (b) his allegations are laden with concessions that the Government did not have exclusive control over the mount during the mount's entire lifetime; and (c) the overriding theme of his allegations has become the uncertainty as to whether the Government agents were negligent or if the Producer and its Staff were negligent, or if some other parties were negligent.  Read <u>in toto</u>, these allegations can no longer be squared with the <u>res ipsa loquitor</u> principle.  In sum, the pleadings: (a) merely state an <u>Iqbal</u>-plausible FTCA claim of garden variety negligence against the Government; and (b) verify that Plaintiff has no facts to plead a plausible claim of any kind against the Producer or its Staff, or against other entity or person.

Plaintiff's resort to an <u>Anderson</u>-like theory cannot cure that deficiency.  The concept of alternative liability is narrow and applied only in the rarest scenarios.

The theory of alternative liability was initially adopted by the California Supreme Court in <u>Summers v. Tice,</u> 33 Cal. 2d 80 (1948).  In <u>Summers</u>, the plaintiff

was [injured] when two hunters *negligently* fired their
shotguns.  Because the defendants fired simultaneously,
the plaintiff was unable to identify which defendant
was actually responsible for the injur[ies.[6]]
The California Supreme Court shifted the burden of
proof to the defendants to offer evidence to determine
which one caused the injur[ies, thus] relax[ing] the
plaintiff's burden of identifying the tortfeasor who
caused the plaintiff's injur[ies].  Because such
[alternative liability] theory is only applicable when
the plaintiff has *already proved that independent acts
of negligence were simultaneously committed by two or
more tortfeasors*, the theory . . . is thus inapplicable
[where the plaintiff] did not present evidence
sufficient to support a finding that both defendants
acted negligently.

Transco Leasing Corp. v. United States, 896 F.2d 1435, 1446 (5th

Cir. 1990) (emphasis supplied) (citing, inter alia, Restatement

(Second) of Torts § 433B (1963), for the observation that the

---

[6]

[In Summers,] Plaintiff's action was against both
defendants for an injury to his right eye and [his lip]
as the result of being struck by bird shot discharged
from a shotgun. . . . [He] and the two defendants were
hunting quail . . . .  Each of the defendants was armed
with a 12 gauge shotgun loaded with shells containing 7
1/2 size shot.  . . .  In the course of hunting,
[P]laintiff proceeded up a hill, thus placing the
hunters at the points of a triangle.  . . .  Both
defendants shot at the quail [at the same moment, and
both were] shooting in [P]laintiff's direction.  . . .
One [bullet] struck [P]laintiff in his eye and another
in his upper lip.

Summers, 33 Cal. 2d at 82.  Since both bullets went astray after
striking the plaintiff, and neither bullet was located in the
woods, an expert correlation of these bullets to the defendants'
shotguns was rendered impossible, and that fact left open the
possibility that both bullets could have been fired from the same
shotgun, and only one defendant, rather than both, might have
been responsible for the plaintiff's injuries.

plaintiff cannot "rely upon the theory of alternative liability
to shift to the [defendants] the burden of exculpating
themselves" without first showing negligence on the part of each
defendant and then showing that the plaintiff could not
reasonably delineate the exact relation between each defendant's
negligence and the plaintiff's injury); see also Huddell, 537
F.2d at 744-45 (stressing that "[t]he usual rule placing the
burden of proof upon a plaintiff has been relaxed in [the rarest]
situations . . . . One such situation is what Prosser has termed
'clearly established double fault and alternative liability.'
That is, both defendants are [shown to be] wrongdoers and, as
such, have brought about the situation in which the victim was
injured. . . . In this circumstance, courts will hold both
defendants liable and impose the burden on each to prove non[-]
culpability") (citing Summers, 33 Cal. 2d 80; Bowman v. Redding
& Co., 449 F.2d 956, 968 (1971); Restatement (Second) of Torts §
433B(3); and Prosser, Torts 243).

     Hence, a plaintiff's reliance on res ipsa loquitor is
unwarranted unless it is shown that *each and all* defendants in
the group were acting *negligently and simultaneously* with all
other defendants in the group.

> Various theories are advanced by [Plaintiff in the
> hope] for dispensing with proof that the [acts] of
> these defendants caused or contributed to caus[ing his
> injury]. Some clearly will not serve to do so. [Those
> the least] in point are concert of action theories,

> where persons acting in knowing collaboration cause an
> injury and are held liable in solido for the effect of
> their common scheme.  Also to be distinguished are
> theories of alternative liability . . . and of group
> res ipsa loquitur.  All of these [theories] concern
> defendants who were proved to have some factual
> connection with the plaintiff's injury; to apply them
> to defendants as to which there is no proof of any such
> connection would beg the question of causation
> entirely.

Thompson v. Johns-Manville Sales Corp., 714 F.2d 581, 582-83 (5th

Cir. 1983).[7]

Although the concept of res ispa loquitor is narrow and that

of alternative liability is even narrower, there is a still-finer

rule st forth in Anderson, which articulated a public policy

exception built on res ipsa loquitor and alternative liability.

> [Anderson presented a consolidated set of actions,
> i.e.,] negligence-products liability actions [that] had
> their inception in [the plaintiff's] back operation,
> performed by defendant [Surgeon].  During the
> [operation], the tip . . . of . . . a forceps-like
> instrument[] broke off while the tool was . . . in
> plaintiff's spinal canal.  The [S]urgeon attempted to
> retrieve the metal but was unable to do so.  . . .  The
> imbedded fragment caused . . . Plaintiff a significant

---

[7]  See also Jesse v. Dick's Sporting Goods, Inc., 2014 U.S.
Dist. LEXIS 45025, at *11-12 ( E.D. Mich. Apr. 2, 2014) ("In
short, plaintiff asserts only that the [his injury was either a
result of one defendant's equipment] or something placed in the
room [belonging to another defendant] (or the wall of [that] room
itself), and cannot even rule out a freak . . . incident.  This
kind of alternative liability argument (if not x, then y) simply
is not enough to create liability on the part of either
defendant.  Thus, this case has not moved from the 'realm of
conjecture' into a 'field of legitimate inferences,' and
plaintiff's speculation is simply not enough to allow him to
survive defendants' motions on the issue of negligence")
(parenthetical in original).

and permanent physical injury . . . .  Plaintiff sued
[the Surgeon] alleging that [the Surgeon's] negligent
action caused the [instrument] to break . . . , [he
also sued] the medical supply distributor which
furnished the [instrument] on a warranty theory [and]
the manufacturer of the [instrument] on a strict
liability [theory], alleging that the [instrument] was
a defective product.  . . .  [W]hen all the evidence
had been presented, no theory for the cause of the
[instrument's] breaking [remained] within reasonable
contemplation save for the possible negligence of [the
Surgeon] in using the instrument, or the possibility
that the [S]urgeon had been given a defective
instrument . . . . [T]he jury [duly instructed on the
<u>res</u> <u>ipsa</u> <u>loquitur</u> principle, as Plaintiff requested,]
returned a finding of no cause as to each defendant.
On appeal, the . . . panel . . . held that the verdict
[in terms of its outcome, was against public policy
because it] represented a miscarriage of justice, and
that on the facts of this case it was clear that one of
the parties was liable [although Plaintiff, who was an
unconscious patient under anesthesia at the time the
surgery took place, had no means to obtain facts
allowing him to implicate one of the defendants more
than the other].

<u>Anderson</u>, 67 N.J. at 294-96.

The Supreme Court of New Jersey admitted that allowing the

<u>Anderson</u> plaintiff "a second chance before a jury" could not have

been done under the <u>res</u> <u>ipsa</u> <u>loquitor</u> principle, <u>see</u> <u>id.</u> at 297

("we note that [sending this] case . . . back on [the basis of an

error in the jury <u>res</u> <u>ipsa</u> <u>loquitor</u> instructions would merely be]

a pretext") but, to remedy the situation, it coined a "relaxed,"

quasi-alternative liability theory without the requirement to

show that all defendants in the group were acting negligently and

simultaneously with all other defendants in the group:

The position adopted by the [appellate panel] seems to us substantially correct [in terms of its public policy reasoning]: that is, at the close of all the evidence, it was apparent that at least one of the defendants was liable for plaintiff's injury, because no alternative theory of liability was within reasonable contemplation.  Since defendants had engaged in conduct which activated legal obligations by each of them to plaintiff, . . . the failure of any defendant to prove his nonculpability would trigger liability . . . .  A no cause of action verdict against all . . . defendants will be unacceptable and would work a miscarriage of justice . . . . [True, in] the ordinary case, the law will not assist an innocent plaintiff at the expense of an innocent defendant.  However, in the [unique] type of case we consider here, where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their [potential] default.  They must prove their nonculpability, or else risk liability for the injuries suffered.

Id. at 298.

Mindful of the fact that Anderson was based on public policy and could not qualify as a true res ipsa loquitor precedent or a genuine alternative liability decision, the Court of Appeals stressed that the "holding in Anderson [was] restricted to instances in which the plaintiff suffered injury while [being] an unconscious hospital patient." Huddell, 537 F.2d at 746.  This Court already explained that very point to Plaintiff in its prior opinion so he would be able to detail his reasons for resorting to an Anderson-like theory.  See Docket Entry No. 3, at 3-4.  In

18

response, Plaintiff filed the position statement wholly barren of
any explanation as to his reasons for selecting the liability
theory implicating, alternatively, the Government agents or the
Producer and its Staff, or other unidentified entities/persons;
the position statement merely offered to this Court Plaintiff's
statement that such liability had to attach.[8]  Based on the
foregoing, this Court will construe the Amended Complaint with
lenience afforded to pro se pleadings, see Erickson v. Pardus,
551 U.S. 89 (2007), and: (a) proceed Plaintiff's FTCA negligence
claim against the Government past the sua sponte dismissal stage;
and (b) dismiss Plaintiff's remaining challenges for failure to

---

[8]  Allowing Plaintiff another opportunity to amend his
pleading as to the Producer or Staff, or the unspecified other
entities, would be facially futile.  True, a plaintiff may be
granted "leave [to amend, but only] when justice so requires."
Foman v. Davis, 371 U.S. 178, 182 (1962); see also Lorenz v. CSX
Corp., 1 F.3d 1406, 1414(3d Cir. 1993).  "Allowing leave to amend
where 'there is a stark absence of any suggestion by the
plaintiffs that they have developed any facts since the action
was commenced, which would, if true, cure the defects in the
pleadings . . . would frustrate [the court's ability] to screen
out lawsuits that have no factual basis.'"  Cal. Pub. Empl'es.
Ret. Sys. v. Chubb Corp., 394 F.3d 126, 164 (3d Cir. 2004); see
also Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 237 (D.N.J.
2002) (procedural safeguards "would be 'meaningless' if judges
liberally granted leave to amend on a limitless basis"); accord
McKinney v. Passaic County Prosecutor's Office, 2009 U.S. Dist.
LEXIS 53216, at *13 (D.N.J. June 24, 2009) ("Since Plaintiff had
[prior] opportunities to plead his claims, and yet failed to
assert any facts suggesting that [these] claims are plausible, it
would be futile to allow Plaintiff [another] bite of this
well-chewed apple"); accord Salyer Land Co. v. Tulare Lake Basin
Water Storage Dist., 410 U.S. 719, 731 (1973) ("adjudication
cannot rest on [a] 'house that Jack built' foundation").

state a claim upon which relief can be granted.  The Government

will be directed to promptly file its response.[9]

---

    [9]  On July 25, 2014, Plaintiff filed an electronic notice
that he served his Amended Complaint.  See Docket Entry No. 5, at
28-29; accord Fed. R. Civ. P. 4(i)(A)(ii) and (B); see also
Docket Entry No. 7 (summons returned executed on July 29, 2014).
In contrast, the Original Complaint did not include any service
document, and so it appeared to the Court that the Government was
unaware of this suit at the time this Court screened the Original
Complaint.  See Docket Entry No. 1.  Thus, this Court directed
the Government to enter an appearance for the purpose of
receiving notice only.  See Docket Entry No. 3, at 7.  On July
28, 2014, that is, three days after Plaintiff stated that the
Amended Complaint was served, the Government, refused to comply
with this Court's order to enter a notice appearance by citing
Fed. R. Civ. P. 4(i).  See Docket Entry No. 7 ("Because the
United States has not yet been served . . . we will not be filing
a notice of appearance").  Putting aside that the Government did
not receive notice as to service of the Amended Complaint because
it refused to allow the Court's Order, the rationale of the
Government's contempt is not immediately apparent to this Court.
A notice appearance is neither a waiver of service nor a
concession of in personam jurisdiction, or does it trigger any
obligation.  It merely enables the party to keep up with the
developments in the matter so, if the need arises, the party is
well positioned to facilitate an expedient resolution of the
matter.  See http://www.njd.uscourts.gov/sites/
njd/files/PoliciesandProcedures2014.pdf (an ECF user who makes
appearance receives "a notice automatically generated . . . at
the time [any] document is filed . . . and [can] retrieve the
document automatically"); see also Docket Entry No. 3, at 6-7
(the Court's order stating that, regardless of notice appearance,
the Government did not have to make any filings until the Amended
Complaint survived sua sponte screening); compare Fed. R. Civ. P.
12(a)(2) ("The United States [if/once subject to in personam
jurisdiction,] must serve an answer"); accord McKnight v. United
States, 2014 U.S. Dist. LEXIS 86164, at *52 (D.N.J. June 25,
2014) (notice appearance by the Government in a newly created
matter, as well as notice appearance by the New Jersey Office of
Attorney General in another newly created matter); Hardwick v.
United States, 2012 U.S. Dist. LEXIS 175914, at *12 (D.N.J. Dec.
11, 2012) (notice appearance by the Government upon sua sponte
screening of a represented pleading); Rodriguez v. New Jersey,
2014 U.S. Dist. LEXIS 84732, at *32-33 (D.N.J. June 23, 2014).

An appropriate Order follows.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: August 4, 2014